THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIE SHORTER, Defendant-Appellant.

First District (3rd Division)   No. 76-1628

Opinion filed April 19, 1978.

470

Lawrence Stephen Galka, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Margaret K. Stanton, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The defendant, Willie Shorter, was charged by indictment with murder, arson to a building, arson to personal property, and attempt (armed robbery). (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1 (a—2), (a—3), 20—1, 8—4.) A jury found the defendant guilty of all four charges, and judgments were entered on the verdicts. He was sentenced to concurrent terms of 75-90 years, 5-15 years, and 5-15 years. The defendant appeals from those convictions, contending (1) that evidence of a subsequent offense was inadmissible and failure to suppress such evidence constitutes reversible error; (2) that his oral statements to police made in the absence of counsel were inadmissible in the absence of any proof that he had intentionally relinquished or abandoned his right to counsel; (3) that the in-court identifications made by several witnesses were improper as was the introduction of testimony at trial regarding two pretrial lineups since the lineups were conducted in the absence of counsel, and that the "*per se* exclusionary rule" must be applied where photographs of lineups held in the absence of the defendant's counsel were introduced into evidence in violation of the defendant's right to counsel; (4) that he was denied a fair trial because at the initiation of jury selection he was brought into the courtroom in custody, in full view of the prospective jurors, and there was a "change of guard," one uniformed sheriff changing position with another directly behind the defendant, again seen by the prospective jurors, thus destroying the presumption of innocence; (5) that certain

evidence introduced at trial was hearsay and improperly admitted; and (6) that certain remarks made by the prosecution in closing argument were improper, prejudicial and warrant reversal.

The testimony adduced at the hearing on the defendant's pretrial motions and at trial established that on the morning of December 12, 1974, at approximately 9 a.m., a passenger later identified as the defendant was picked up near 76th Street and Vincennes in Chicago by a Yellow cab driven by Michael Lewis. The passenger asked to be driven to 75th Street and Dobson, where he picked up two empty gas cans, stating to Lewis that his car had run out of gas. The cab then proceeded to a gas station at 75th Street and Indiana where the rider filled the cans with gasoline while the cab driver waited. After the gasoline was paid for, the cab driver then took his fare to 69th Street and Wentworth Avenue where the passenger left the cab taking the cans with him, and asked the cab driver to wait. Less than five minutes later the passenger returned to the cab and said, "Hurry, let's get out of here." About a block and a half away, the passenger again left the cab, ran across a parking lot and disappeared.

A currency exchange at 6907 South Wentworth was totally destroyed by fire on the morning of December 12, 1974. The body of Estelle Davenport, the cashier on duty at the currency exchange, was found in the ruins along with two gas cans, an electric capacitator and a battery. The cab driver and two gas station attendants, Randall Turner and Nelson Cook, identified the defendant, Willie Shorter, as the man they had dealt with on the morning of December 12, 1974. Another witness, John Pasdo, saw a man he later identified as Willie Shorter from lineup photographs get out of a Yellow cab near 69th and Wentworth and go around the corner heading south on Wentworth. The man was gone about five minutes when he returned to the cab and was driven away. Immediately thereafter, the witness saw smoke coming from around the corner and ran to the currency exchange to get everyone out of the building. Pasdo, a City of Chicago sewer worker, was at work at the same location the following day, and saw the defendant again. Another witness, Peter Garcia, testified that as he was waiting for a traffic light to change at the corner of 69th and Wentworth at about 9:30 a.m. on December 12, 1974, he saw a man kick out the window of a currency exchange, almost stumble out into the street, and rush off in a taxicab. Seconds later, the currency exchange was on fire. While Garcia was unable to identify the man, he was able to identify the cab as a Yellow cab, number 473. That was the same taxi cab driver Michael Lewis had been assigned the morning of December 12, 1974. However, another witness, Darlene Dotson, testified that on the morning in question she saw a man throw a package through the currency exchange window. The window broke, there was an explosion, and "then the whole place went up." The man ran

into the street, where a cab almost hit him. When the cab braked and stopped, the man entered the cab and it pulled away. The witness stated that the man she saw was not the defendant.

Evidence was also introduced regarding the defendant's alleged attempt to commit armed robbery and arson at another currency exchange on December 31, 1974. On that date at about 1 p.m., a man wearing a green army jacket and light colored pants entered a currency exchange at 5950 South State Street threatening to burn down the building if the cashier did not give him "some money." The man carried a brown paper bag containing two Clorox bottles filled with gasoline. When the man began pouring the gasoline on the counter and splashed it into the tray directly in front of the cashier, she pressed a button activating a silent alarm and also pressed a buzzer which locked the front door. When the man heard the buzzing sound, he turned and ran, pulling on the front door. When, according to the cashier, it would not open, "he just went through the window." A police bulletin reported a robbery in progress and described the suspect as a male Negro wearing an army fatigue jacket and light colored pants, possibly injured from going through the glass door of the currency exchange. The defendant was arrested about a block away, bleeding from a face laceration. When questioned by police officers after having been given the *Miranda* warning at Provident Hospital where he was taken for treatment, the defendant admitted that on December 12, 1974, he had entered the currency exchange on Wentworth Avenue with two cans of gasoline. He stated that he and the cashier were going to rob the currency exchange and that she was going to pay him $500 for his part in the scheme. He told the police that the fire started after he poured gasoline on the floor and the cashier threw lighted matches on the liquid. When asked if he would give a written statement, the defendant responded that he would like to consult with an attorney before doing so.

Later that same afternoon, the defendant was questioned by police officers regarding both the attempted robbery and arson which had occurred that day, and the incident at the currency exchange at 69th and Wentworth in which a woman was killed on December 12. This questioning was again preceded by the giving of *Miranda* warnings, which the defendant acknowledged he understood. The defendant stated that he had started that fire.

Prior to trial there was a hearing on the defendant's motions to quash his arrest, suppress lineup identification and testimony relating thereto, and suppress oral statements. Following a hearing, the court denied all three motions. In addition, the defendant's pretrial motion in *limine* to prohibit admission of the testimony of Earnestine Patterson regarding the subsequent offense due to its extremely prejudicial nature was denied.

The court concluded that her testimony could be introduced for the limited purpose of showing intent, motive, common scheme and design.

■■ The defendant initially contends that it was error to allow the State to introduce evidence of the defendant's alleged attempt to commit armed robbery and arson at another currency exchange subsequent to the offense for which he was being tried. While the general rule is that evidence of crimes other than that for which a defendant is being tried is inadmissible (*People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288), evidence which shows motive, intent, identity, absence of mistake, or a common scheme or design is admissible even though it shows the commission of a subsequent offense. *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.

■■ Just prior to Patterson's testimony at trial, the jury was instructed as to the limited purpose of her testimony, and a similar written instruction was given at the close of the case. In the present case, the evidence established that both attempted armed robberies and arsons occurred at currency exchanges where only one employee, a woman, was on duty. Both were in the same general area of the city, within two miles of each other. On each occasion, the perpetrator carried two containers of gasoline into the building, and escaped by kicking out the front door window. In view of the "peculiar and distinctive features" common to the occurrences of both December 12 and December 31, 1974 (*People v. Lehman* (1955), 5 Ill. 2d 337, 343, 125 N.E.2d 506), we agree with the trial court that the similarities in the character of the two crimes and the mode of operation used during the course of both were sufficient to warrant the introduction of evidence of the subsequent offense for the limited purpose of showing common scheme or design, intent or motive. *People v. Nelson* (1974), 17 Ill. App. 3d 224, 227, 308 N.E.2d 122.

The defendant also contends that the two oral statements he made to police should not have been admitted into evidence since he was denied the assistance of counsel at the time they were made. After the defendant's arrest, he was taken to Provident Hospital for treatment of a facial laceration. While at the hospital the defendant was advised of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and acknowledged that he understood each of his rights. The defendant then admitted his involvement in the fire at the currency exchange at 69th and Wentworth on December 12, 1974. When asked if he would give a written statement, the defendant replied that he would like to consult with an attorney before giving any written statement. The questioning immediately ceased. Later that afternoon when the defendant was taken to the police station, he was again informed of his *Miranda* rights and following further questioning

regarding the December 31, 1974 incident, again stated that he had started the fire on December 12, 1974.

The Illinois Supreme Court in *People v. Higgins* (1972), 50 Ill. 2d 221, 227, 278 N.E.2d 68, articulated a standard by which the State may prove a voluntary waiver by the accused of his constitutional protections:

"An express, formalistic waiver is unnecessary for '[a]ny clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances.' (*State v. Kremens* 52 N.J. 303, 245 A.2d 313, 317.) As in the present case, '[o]nce the defendant has been informed of his rights and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them.' *People v. Johnson*, 70 Cal. 2d 541, 450 P.2d 865, 876."

In the case at bar, there was a hearing on a motion to suppress the oral statements of the defendant. At that hearing, the court determined that the defendant's statements were freely and voluntarily given. That decision should not be overturned unless it is manifestly against the weight of the evidence. (*People v. Johnson* (1969), 112 Ill. App. 2d 148, 155, 251 N.E.2d 393.) In *Johnson*, the defendant gave an oral inculpatory statement without the presence of counsel after he had been given the *Miranda* warnings and after he had shown that he was "fully aware of his rights by answering 'yes' after each warning." He was asked but refused to make a written statement. The court held that these circumstances demonstrated a "fully effective equivalent" to an express waiver, noting that the defendant's "refusal to make a written statement demonstrated an awareness of his rights and the ability to exercise them. It also indicates that he had this knowledge and ability when he gave his oral statement and that he made a knowing, intelligent waiver of rights at that time."

■■ The first statement made by the defendant at the hospital came after his expression of understanding of the rights of which he had just been advised and before his refusal to make a written statement before speaking with an attorney. The parties do not dispute the fact that following the defendant's assertion at the hospital that he would rather speak to an attorney before making a written statement, all questioning ceased. The trial court's determination that this statement was voluntarily made and constituted a waiver of his rights was proper.

There is a question, however, as to the propriety of the questioning that occurred later that afternoon at police headquarters, where again after having been advised of his rights, the defendant made another oral inculpatory statement to police of substantially the same nature as the

first. In *People v. Williams* (1970), 131 Ill. App. 2d 149, 155-56, 264 N.E.2d 901, the court noted that while a defendant has an absolute right to the presence of counsel during a custodial interrogation under *Miranda*, "[t]he fact that the defendant requests the assistance of an attorney * * * does not preclude the defendant from subsequently making a statement without an attorney present if the statement is made knowingly and voluntarily." While courts require questioning to cease when a defendant requests an attorney and place a heavy burden on the prosecution to rebut the presumption that any statement taken thereafter is not a result of waiver but of compulsion (see, *e.g., People v. Parnell* (1975), 31 Ill. App. 3d 627, 630, 334 N.E.2d 403; *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27), the Illinois Supreme Court held in *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457, that failure to furnish requested counsel during custodial interrogation did not render the defendant's confession to another crime, given two days after his request for an attorney, inadmissible. There the defendant had stated at the time of his arrest that he wanted to speak to an attorney before talking to police, and interrogation ceased. Later that afternoon he was again given *Miranda* warnings and was questioned about other offenses. The next morning, he was questioned with respect to an unrelated offense to which he confessed. In connection with that interrogation he was given full *Miranda* warnings. That afternoon, again preceded by *Miranda* warnings, he was questioned about and confessed to another unrelated crime. The following day, preceded by *Miranda* warnings, the defendant signed the confession involved in the appeal. The reason for the failure to furnish a lawyer was unclear. The record disclosed that the defendant had a low "I.Q." and was a "borderline retardate."

The court found that although the defendant's I.Q. was low, there was testimony by the interrogating officer that he understood his rights when they were read to him, and there was no claim of police brutality. The defendant himself had only a vague recollection about being held in the police station, and no recollection at all of being interrogated or signing any confessions. The court concluded:

> "While the case is a close one, we are of the opinion that the effect of the procedural violation of the *Miranda* standards was sufficiently dissipated by lapse of time, repeated admonitions and other intervening events so that the defendant's confession was voluntary and was therefore properly received in evidence." *White*, 61 Ill. 2d 288, 297.

In the case at bar, the trial court found at the hearing on the motion to suppress the oral statements that "there is sufficient attenuation between the ceasing of the questioning in the hospital after petitioner stated he wished to confer with counsel before giving a written statement

and the resuming of questioning at the police station several hours later and that this attenuation is such as to remove any taint which may be occasioned by no counsel being present at the police station for these later oral statements." Here the defendant demonstrated his understanding of his rights by refusing to make a written statement without first speaking to an attorney. (*People v. Johnson* (1969), 112 Ill. App. 2d 148, 156, 251 N.E.2d 393.) In view of his awareness and exercise of his rights, we believe that the trial court's determination that the defendant made a knowing intelligent waiver was not against the manifest weight of the evidence.

■■ The defendant next argues that the in-court identifications made by several witnesses were improper as was the introduction of testimony at trial regarding two pretrial lineups since the lineups were conducted in the absence of counsel. He also argues that the "*per se* exclusionary rule" should have been applied where photographs of lineups held in the absence of his attorney were introduced into evidence. Two separate lineups are involved. The first lineup was conducted on December 31, 1974, within hours of the attempted armed robbery of the currency exchange at 5950 South State Street at a time when the right to counsel had not attached. The defendant was still only a suspect as to this offense; no sworn complaint had issued and no "adversary judicial criminal proceedings" had commenced relating to the December 31 incident. (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) The viewing by the victim of that crime, Earnestine Patterson, and her testimony referring to the identification she made at that lineup were therefore proper.

■■ Although Michael Lewis, the cab driver who had identified the defendant from photographs following the incident on December 12, 1974, had come to the police station on December 31 to view a lineup, he did not do so. However, while waiting at the station, Lewis inadvertently saw the defendant standing with two other men in a room across the hall from him. The trial court, at the hearing on the defendant's pretrial motions, found that Lewis' viewing of the defendant was inadvertent, and that any in-court identification of the defendant would be untainted since it had an independent origin. In view of the amount of time the defendant had spent in Lewis' cab, the fact that Lewis saw the defendant as he got into and out of the cab at least four times during the trip, and the fact that Lewis had identified the defendant the day after the incident from photographs he viewed at the Illinois Bureau of Vehicle Registration, there was a sufficient independent basis for any such identification. Any bolstering of Lewis' in-court identification by reference to his inadvertent viewing of the defendant at the police station, if error, was harmless.

■█■ As to the lineup conducted on January 21, 1975, at which Randall. Turner and Nelson Cook, the two gas station attendants, viewed the defendant, there can be no question that the defendant was entitled to counsel at this stage of the proceedings. Both witnesses testified as to this lineup identification. However, we disagree with the defendant that the absence of counsel at the lineup requires us to reverse the judgment of the trial court. The requirement of counsel's presence is founded upon notions of due process, and if the totality of circumstances surrounding the identification process clearly indicates attention to due process, the absence of counsel at the lineup is not fatal to the judgment reached by the trial court. (*People v. Marshall* (1977), 47 Ill. App. 3d 784, 786, 365 N.E.2d 367.) While testimony concerning identifications made at the uncounseled lineup was subject to the *per se* exclusionary rule enunciated in *Gilbert v. California* (1967), 388 U.S. 263, 273, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, subsequent in-court identifications made by witnesses who had also identified the accused at the tainted lineup were still admissible if based on a source independent of and untainted by the identifications made at the lineup. Factors to be considered in determining whether the evidence sought to be introduced is from a sufficiently independent source and therefore purged of the primary taint include:

"* * * the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." *United States v. Wade* (1967), 388 U.S. 218, 241, 18 L. Ed. 2d 1149, 1165, 87 S. Ct. 1926.

■█ In the case at bar, there was a pretrial hearing at which the trial court determined that in reference to the lineup of January 21, 1975, an effort was made to notify the defendant's attorney of the lineup, and that there was no evidence that the police conducted the lineup in any manner that was suggestive or improper. Both witnesses who viewed this lineup had sufficient opportunity to observe the defendant. Both had previously identified the defendant from a series of photographs shown to them by investigating officers within 24 hours of their encounter with the defendant. While testimony regarding the lineup held in the absence of the defendant's attorney should have been excluded, the record shows that the in-court identification of the accused had an origin independent

of the lineup and that the error was harmless and not ground for reversal on appeal. *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 705, 87 S. Ct. 824; *People v. McDonald* (1975), 62 Ill. 2d 448, 453-54, 343 N.E.2d 489.

■■ At trial, John Pasdo testified that immediately before he was called to testify he was shown photographs of the two lineups and was able to identify the defendant. In open court, he again identified the defendant by circling him on the lineup photos and also made an in-court identification of the defendant as the man he had seen on December 12 and 13, 1974. The first photograph shown to Pasdo was of the December 31, 1974, lineup which we previously held was properly conducted. Any error from use of the photograph of the January 21, 1975, lineup was cumulative and therefore harmless.

■■ The defendant next contends that he was denied a fair trial because he was seen by the prospective jury panel being escorted into the courtroom by a sheriff's deputy, and later the prospective jurors saw one deputy take the place of another behind the defendant. He argues that this "changing of the guard" and manifestation of the fact that the defendant was in custody destroyed the presumption of innocence to which he was entitled. However, the incidents described by the defendant were nothing more than minor security measures and common courtroom procedure. There is no showing that in the instant case the defendant's right to a fair trial was impaired in any way. See *People v. Glasco* (1966), 66 Ill. App. 2d 445, 448-49, 214 N.E.2d 495.

■■ The defendant also argues that certain hearsay evidence introduced at trial was improperly admitted to the defendant's prejudice and was a denial of his sixth amendment right to confront witnesses against him. The defendant's theory of the case was that someone else was responsible for the fire at the currency exchange at 6907 South Wentworth. A defense witness testified that she saw someone not the defendant throw a package through the window of the currency exchange. Shortly thereafter, "the whole place went up," and the man ran out into the street and jumped into a taxi. There was evidence that an electrical device, a capacitator, had been found at the scene but there was no further evidence suggesting a link between what was allegedly thrown through the window and the capacitator that was found in the ruins of the fire. During the cross-examination of Officer Webb Threet, an arson investigator for the Chicago Police Department, defense counsel asked, over objection, whether such a device could be used for igniting a fire. The witness responded that he had no opinion at all. On redirect the witness was asked if other expert opinion was sought as to whether or not the capacitator could have had anything to do with the fire. Answering

affirmatively, the witness related that the result was that it could "in no way cause an ignition or cause a fire." The defendant presented no further evidence to show that the capacitator could in fact have been related to the fire. The defendant does not describe the prejudicial effect of this witness' testimony, but merely states that a new trial is warranted. In light of these facts, the overwhelming evidence presented against the defendant, and the absence of any further evidence introduced in support of the defendant's theory that the capacitator was used to start the fire, we fail to see how the admission of this hearsay prejudiced the defendant's case. Failure to exclude this testimony was harmless error.

■■ Finally, the defendant contends that closing remarks by the State's Attorney were improper and sufficient to cause reversal. However, in the context of defense counsel's statements at trial, the response of the State was not improper or unreasonable. Defense counsel had based his argument on the notion that the State's witnesses were willing to alter their testimony "to fit the theory that the State [was] trying to sell." It was in response to this and similar urgings not to become a "lynch mob" that the State's Attorney accused defense counsel of "talking out of both sides of his mouth" and that a particular defense tactic was "a con job." Where a defendant claims prejudice resulting from certain remarks made by the prosecution in closing argument, he must establish that there was a reasonable possibility that the questionable language, in light of all of the evidence, was a material factor in his conviction. (*People v. Nicholls* (1969), 42 Ill. 2d 91, 100, 245 N.E.2d 771; *People v. Barksdale* (1974), 24 Ill. App. 3d 489, 502, 321 N.E.2d 489.) In the case at bar, we do not believe that the prosecutor's statements substantially prejudiced the defendant's rights, nor were they a material factor in his conviction.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

SIMON and McGILLICUDDY, JJ., concur.