THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LARRY WATSON, Defendant-Appellant.

Fifth District    No. 80-11

Opinion filed July 14, 1981.

John H. Reid and E. William Hutton, both of State Appellate Defender's Office, of Mt. Vernon, and Steven L. Merker, research assistant, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

At a bench trial defendant, Larry Watson, was found guilty of rape

and was sentenced to a term of imprisonment of six years. On appeal he raises the following issues: (1) whether the trial court erred in denying his motion *in limine*; (2) whether he was denied effective assistance of counsel; and (3) whether the trial court erred in denying defense counsel's motion for a continuance. Since no issue is raised as to reasonable doubt, a complete recitation of the facts is not warranted. Only those facts pertinent to the issues raised will be provided as required.

The motion *in limine* sought to exclude testimony pertaining to defendant's participation in a prior offense for which he was not currently on trial. The trial court denied the motion after reviewing statements given to the police by the instant victim and the victim of the unrelated offense. The court found the details of the incidents to be so related as to reflect a similar *modus operandi*. The court went on to note that the probative value of the evidence of the other offense outweighed its prejudicial effect.

In ruling on the motion the court presented a detailed summary of the victim's statements. Both victims were young black females who were abducted in the early morning hours by a man driving an automobile. Each woman was offered a ride, and when she refused she was forced into the vehicle at gun point. The instant victim, Cynthia, described the weapon as a .38-caliber snub nose while Clara, the victim in the other offense, described the weapon drawn on her as a big-barreled pistol. As each woman entered the vehicle, she was instructed to keep her head down. The instant victim described the automobile as a powder blue Ford Thunderbird with a powder blue crushed velvet interior. The other victim described the vehicle as a light blue Buick with a crushed velvet interior. Each woman was driven around for a period of time while her abductor engaged in conversation concerning her personal life. One victim was later forced into the trunk of the automobile whereas the other was threatened that if she did not cooperate she would be placed in the trunk. Each rape occurred in a building. Each woman, prior to inter-course, was requested to remove her bottom clothing and was initially naked from the waist down. The abductor achieved an erection and climax in each rape. The court found this to be significant, taking judicial notice that rapists frequently fail to ejaculate. Each woman's rape was followed by a deviate sexual act. The abductor attempted anal inter-course upon one, and he forced the other to place his penis in her mouth. Cynthia described the abductor as being five feet nine inches tall with neat afro hair and neat sideburns. Clara described her attacker as being tall, with a mustache, heavy eyebrows, neat afro and long, neat sideburns. At trial each woman made an in-court identification of defendant as the man who assaulted her.

Ordinarily, evidence of unrelated offenses is inadmissible. As a

general exception, however, evidence of other crimes is admissible to establish identity, absence of mistake or accident, motive, knowledge, or a common scheme or design. (*People v. Lehman* (1955), 5 Ill. 2d 337, 128 N.E.2d 506.) Other courts have included in this list of exceptions *modus operandi*, which is nothing more than circumstantial evidence of identity, the rationale being that crimes committed in a similar manner suggest a common author. *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; see *People v. Gleason* (1962), 36 Ill. App. 2d 15, 183 N.E.2d 523.

In *People v. Therriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999, the court held that the following points of similarity established a distinct *modus operandi*: (1) the rapes occurred within similar apartment buildings located within five blocks of each other; (2) entry in each case was through a kitchen window of a ground floor apartment; (3) a gun was used in each offense; (4) the victims were raped in a bedroom; (5) the attacks took place in the early morning hours; (6) each attack lasted approximately 15 minutes; (7) the rapist stole money from the purse of the victims; and (8) the offenses occurred one month apart.

In *People v. Emmett* (1975), 34 Ill. App. 3d 167, 340 N.E.2d 235, the points of similarity were: (1) the victims both lived in buildings with elevators and the buildings were five blocks apart; (2) a knife was used in both attacks; (3) the rapist also performed identical acts of sexual deviancy; (4) the rapist initiated conversations with both women; and (5) the rapist asked for money in each case but took none.

We find the points of similarity in the instant case to be as compelling as those in *Therriault* and *Emmett*. Here the rapist's victims were both young black women. They were accosted by a man driving an automobile of a similar color with a similar interior. A handgun was used in each case. Each woman was ordered to keep her head down as she entered the vehicle. The rapist in each instance inquired as to his victim's personal life. One woman was placed in the trunk whereas the other was threatened that she would be placed in the trunk. Each woman had her clothing initially removed from the waist down, and both were raped in a building. Following each rape was a deviate sexual act. The totality of the similarities between the two rapes strongly suggests the actions of the same person.

In arguing that evidence of the prior rape should not have been admitted, defendant underscores the following differences in the two incidents: (1) different pistols were used; (2) different automobiles were used; and (3) different deviate sexual acts were performed. However, we find it significant that each case involved a pistol, an automobile, and deviate sexual behavior. Defendant further argues that no single factor in the two incidents was unique. We do not find this controlling. The significant aspect is the similarity of the rapist's conduct in each of the

offenses. Moreover, it should be noted that placing one victim in a trunk of a vehicle and threatening to do so to another cannot be said to completely lack uniqueness.

■■ Where the other rape shares so many similar features with the instant offense, we conclude that the testimony of the first victim was properly admitted to establish identity and that the trial court did not err in denying defendant's motion *in limine*.

Defendant also argues that as a result of the erroneous denial of his motion *in limine*, his right to a trial by jury was adversely and involuntarily affected. In view of our holding that the trial court properly denied the motion, we find no merit to this contention.

Next, defendant contends that he was denied effective assistance of counsel where his privately retained counsel pursued a line of cross-examination which ultimately revealed that seven women had identified defendant as being a rapist in a lineup. During cross-examination of the victim in the case at bar, defense counsel asked where she was sitting during the lineup in relation to the victim in the prior rape. She replied that there were three other women between them. Continuing, counsel asked who these women were, and Cynthia answered that they were the women who had been raped. Defense counsel pursued this line of questioning and elicited from Cynthia that seven women in all had identified defendant. However, when pressed as to how she knew the other women at the lineup identified defendant, she replied that she was unable to explain how she arrived at this conclusion. Defendant urges that as a result of defense counsel's line of cross-examination, it was suggested that six other women had been raped.

Defendant contends that his retained counsel's representation would not satisfy the "minimum standards of professional representation" test employed by some Federal jurisdictions, citing *Cooper v. Fitzharris* (9th Cir. 1978), 586 F.2d 1325, *United States v. Bosch* (1st Cir. 1978), 584 F.2d 1113, *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, and *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677 (Clark, J., specially concurring). In the alternative defendant argues that the level of representation reduced the proceedings to no more than a sham and a farce, thereby denying defendant a fair trial.

■■ This court has recently held in *People v. Scott* (1981), 94 Ill. App. 3d 159, 418 N.E.2d 805, that the test for determining incompetency of retained counsel and appointed counsel is the same and that a defendant is entitled to a new trial if counsel was actually incompetent, as reflected in the performance of his duties as trial attorney, and if this incompetence produced substantial prejudice to the defendant, without which the result of the trial probably would have been different. (See *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *People v. Murphy*;

*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203.) Trial counsel's competency will not be judged by a court of review on the basis of errors in judgment or trial strategy. (*People v. Atkins* (1980), 81 Ill. App. 3d 661, 402 N.E.2d 383; *People v. Thompson* (1978), 66 Ill. App. 3d 141, 383 N.E.2d 690.) Nor may proof of prejudice be based on mere conjecture or speculation. *People v. Hills* (1980), 78 Ill. 2d 500, 401 N.E.2d 523; *People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3.

The cross-examination of the victim by defense counsel is as follows:

"Q. Cynthia, when was the first time you met Clara * * * [the other rape victim]?

A. At the lineup.

Q. And I take it you had no conversation with her during that period of time?

A. No.

Q. At the lineup, where were you seated in respect to Clara, as you viewed the lineup?

A. About three girls away.

Q. Were there three girls between you and Clara?

A. Right.

Q. Who were they?

A. Other girls who had been raped.

Q. Do you know their names?

A. No, I do not.
* * *

Q. And the other two girls who's [*sic*] name you do not know, where were they, at the police station?

A. There were more than two other girls. There was [*sic*] about five other girls.

Q. So there is a total of seven girls transported down to the lineup?

A. Yes.
* * *

Q. Getting back to this lineup, did any of these seven girls identify anybody in that lineup?

A. Yes.

Q. Who?

A. That man right there (pointing to defendant).

Q. What girls?

A. All of them.

Q. Do you remember which position he was in?

A. Yes.

Q. Which one?

A. Third.

Q. Now, how did you know that each one of these girls identified Mr. Watson?

A. Because they told us that was the man.

Q. Who told you?

A. After we identified him.

Q. But my question was, how did you know that each one of the girls identified Mr. Watson?

A. I don't know."

It is apparent that defense counsel was not trying to expand upon the number of women who identified defendant as a rapist when he began this line of questioning. He attempted to explore the circumstances surrounding the lineup in an effort to shake the victim's identification of defendant. When he inquired as to the other ladies viewing the lineup, he sought their names, not whether they were raped by defendant. The victim's answer was totally unexpected. This is evident from counsel's follow-up question concerning the names of the other women. At this point counsel had no other option but to continue to explore the lineup procedure in an attempt to neutralize the prejudice which resulted from the victim's volunteered testimony. Moreover, he was successful in discrediting the victim somewhat when he got her to admit she had no basis for asserting that the other six women recognized defendant.

Counsel's decision to inquire about the lineup procedure was a matter of trial strategy and did not constitute incompetency. He cannot be held responsible for the witness' unresponsive and unexpected answer to his question concerning the identity of other women at the lineup. In the face of the prejudice engendered by this testimony, counsel had no choice but to attempt to diffuse the prejudice by attacking the basis for the victim's conclusion, and he partially succeeded. On the basis of these facts, we conclude that defendant was not denied effective assistance of counsel.

Defendant also contends that the trial court erred in denying his motion for a continuance. A discovery motion was filed August 29, 1979, wherein defendant requested that the State furnish a copy of a scientific report prepared by serologist Dennis Aubuchon regarding certain blood tests. On November 6, 1979, the first day of trial, defendant renewed this discovery request. The State then provided an oral summary of the test results which showed that defendant had type "O" blood, Clara had type "A" blood, and certain blood on Clara's blue jeans was type "A."

Defense counsel received a copy of Mr. Aubuchon's reports on the morning of the second day of trial. Following the presentation of two defense witnesses, defense counsel renewed his discovery motion and requested that saliva tests be made. He acknowledged receipt of the reports and noted that the serologist who conducted the blood tests

requested a saliva standard of defendant, Cynthia, and Clara. On the basis of the report, defense counsel stated:

> "Apparently there is some, possibly, some sort of exclusion type test could be run or some kind of a match-up type test could be run if this saliva were made available to Mr. Aubuchon."

Counsel then moved the court to order that saliva samples be taken and to continue the bench trial until the testing of the samples. The assistant State's Attorney objected to the continuance stating:

> "The results of anything in this case [the alleged prior rape of Clara] would not have any bearing on the * * * [instant] case as the sperm slides are not possible to be typed."

In denying defendant's request for a continuance, the court found that Dennis Aubuchon had made a report, dated May 22, 1979, regarding Clara, which was furnished to the defendant at his arraignment on October 12, 1979; and that on that date the defendant received a report, dated September 6, 1979, regarding the instant victim. The court further found that blood samples were submitted to Dennis Aubuchon for analysis on August 22, 1979, from both the victims and the defendant; that on October 29, 1979, the State filed a motion to take a blood sample from the defendant, which order was granted over the defendant's objection; and that the September 6, 1979, report relating to the instant victim reflected that she furnished a saliva sample to Aubuchon on August 9, 1979. The court also stated that although the defendant apparently believed that additional testing would develop evidence favorable to the defense, there was no offer of proof or information before the court as to what probative value, if any, further tests might have. The court commented that the forensic scientist had a blood sample on each of the victims from at least October 12, 1979, and that if the defendant had desired any further testing, he could have voluntarily submitted his blood sample and had further testing performed prior to trial. The court also noted that the defendant had not attempted to subpoena Aubuchon for trial. The court, reiterating its conclusion that there was no identification of what further testing would prove, then held that defendant's request was untimely.

Defendant argues that the denial of the motion constituted an abuse of discretion where defense counsel was not apprised of the request by the State's expert for saliva samples, where the prejudice from the delay would have been minimal in the context of a bench trial, and where it was impossible for counsel to make an offer of proof on the basis of the results of tests which were never performed.

■■■ All motions for continuance are addressed to the discretion of the trial court and shall be considered in light of the diligence shown on the part of the movant. (Ill. Rev. Stat. 1979, ch. 38, par. 114—4(d)(e).) The

granting of a continuance to permit preparation for a case is a matter resting within the sound judicial discretion of the trial court, and the court's ruling will not be disturbed on review unless it is shown that the discretion has been abused. (*People v. Wilson* (1963), 29 Ill. 2d 82, 193 N.E.2d 449.) It is only where the record shows that the trial court has abused its discretion in denying a reasonable time for the preparation for the defense that a reviewing court will interfere. (*People v. Kendall* (1956), 7 Ill. 2d 570, 131 N.E.2d 519.) Where a defendant's request for a continuance is necessitated by his own lack of cooperation, the denial of his request will not be set aside. *People v. Solomon* (1962), 24 Ill. 2d 586, 182 N.E.2d 736.

Here, defendant cannot claim that he had insufficient time to prepare for trial where defense counsel filed his discovery motion August 29, 1979, and the trial of the case commenced November 6, 1979. Nothing was withheld from the defendant, and it appears that the defendant was kept abreast of the tests and reports. With respect to the final report, the record shows that the State orally informed the defendant of the results obtained prior to the time that the State itself had received the report and furnished a copy of such report to defendant, apparently at the first opportunity.

The paramount consideration, however, is that nothing in the record demonstrates the efficacy of further tests. To exonerate the defendant, who had type "O" blood, the evidence would be required to establish that the blood type of the sperm recovered from the victim in the instant case, Cynthia, was other than type "O"; however, according to the prosecutor, the sperm of her assailant which was recovered from Cynthia was not capable of being typed. Had the sperm test indicated that Cynthia's assailant had the same blood type as the defendant, saliva testing possibly could have elicited further blood factors other than the basic type which might have excluded the possibility that the sperm came from the defendant. However, since the blood type of Cynthia's assailant was unknown, the basis for a comparison of such blood type with defendant's is absent, and the entire blood testing process becomes irrelevant. Moreover, there is nothing in the record or suggested in the scientific article which defendant has appended to his brief to indicate that a more specific typing from the saliva is possible had the results of any such test been relevant in the instant case.

■■ In sum, we hold that defendant's motion for a continuance was properly denied because it was not timely and because there was no assurance that further testing would not be an exercise in futility.

For the same reason, defendant's argument that counsel was ineffective for failing to insure that the tests were completed prior to trial must fail, since there it is apparent that the outcome of the trial probably would not have been different had the tests been completed.

For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County finding defendant guilty of rape.

Affirmed.

JONES and KARNS, JJ., concur.