THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EARLEY JOHNSON, Defendant-Appellant.

First District (5th Division)   No. 80—1045

Opinion filed September 24, 1982.

Jonathan C. Moore and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and Robert A. Loeb, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:
Following a jury trial defendant was convicted of rape, deviate sexual assault, armed robbery, and aggravated kidnaping (Ill. Rev. Stat. 1979, ch. 38, pars. 11—1, 11—3, 18—2 and 10—2). On appeal, he

contends that: (1) he was denied a fair trial by the trial court's failure to admit into evidence a police artist sketch based on the complaining witness' description; (2) he was denied his right to counsel of his choice because the trial court failed to appoint him a private, bar association lawyer; (3) he was not proved guilty beyond a reasonable doubt; and (4) his concurrent sentences of 20 years on 3 counts and 10 years on the other are an abuse of discretion. We affirm.

In the early morning hours of December 1, 1978, Hilda Williams, the complainant, was accosted by a man as she stood by her car near her home. The man aimed a gun at her head, threatened her and pulled her back into the car. He told her it was a "stick-up" and ordered her to drive. Complainant turned on the alarm in her car but switched it off after he threatened to kill her. As they drove defendant asked her if her parents would pay ransom for her. He held the gun to her head and told her to perform oral sex on him. During the course of the next six hours he took her diamond ring, fox jacket, and cash. He forced her to perform fellatio on him two more times and have sexual intercourse with him twice. He also made her get into the trunk of her car for awhile and threatened to kill her. After her assailant left her in her car at approximately 9:30 a.m., complainant drove home to her mother, who took her the hospital and summoned the police.

Defendant, Earley Johnson, was arrested. Complainant identified him from police photographs, a lineup, and in court. Her identification of defendant was based on several factors. She testified that she was able to see her assailant during the first part of the six-hour ordeal because she was sitting next to him, the car light was on at times, headlights from a car behind them provided light, and for part of the time it was light outside.

Complainant further testified that she noticed a mark on defendant's right knee during one of the times she was forced to perform fellatio on him. The mark or mole was pinkish with white spots and was approximately the size of a quarter.

She described her assailant at trial as 5'8" tall, dark complected, bushy haired, 165-175 pounds, and 26-28 years old. She also related that he had a large, wide nose with large nostrils and had long sideburns running to the corner of his mouth. On cross-examination she testified that she told police at the time that her assailant had a beard and a mustache. A defense witness, Officer Theodore Davis, who interviewed complainant at the hospital, testified that he could not recall her saying that her assailant had a beard or a mustache, although she said that he had long sideburns, down to his mouth.

On December 2, 1978, complainant went to the police station to view photographs. She selected defendant's photograph from approximately 1,000-1,500. In the photograph, he wore a mustache and beard.

On December 26, 1978, complainant viewed a lineup but did not identify anyone as her assailant. Afterwards she again identified defendant's photograph. Two days later, complainant worked with a police artist to create a sketch from her description. On cross-examination at trial complainant testified that she told the artist that her assailant had a round, medium-sized face, medium length hair combed back but not processed, medium-sized lips and hairy, curved eyebrows. She also testified that she could see her attacker's nostrils and that she could not recall if she told the artist that the man had lines on his forehead.

On December 30, 1978, complainant identified defendant in another lineup. The same officer who had conducted the first one was present. When she told the officer about the mark on her assailant's knee the officer examined defendant and saw a scar or mole on his right knee. He also testified that he did not notice a 10" scar on defendant's kneecap which was 3" from the mole.

The parties stipulated that sperm was present on complainant's underpants and that no fingerprints of defendant were recovered from her car.

The defense called Officer John Holmes, the police artist who drew the sketch based on complainant's description. He explained the procedures involved and stated that he customarily worked alone with the witnesses, and did not learn any details of the cases or parties involved in criminal prosecutions. Holmes identified a drawing that he had completed but testified that he did not recall whether it was the drawing he made from complainant's description in December of 1978. He had drawn approximately 75-100 composite sketches within the preceding 10 months and did not learn the names or facts surrounding the persons he drew and the witnesses who described them. He described the drawing that defense counsel showed him as being of a man with a long face with prominent jaws, "natural" hair, with larger than average lips and arched eyelids. He said the nostrils were not visible and the forehead was clear, or unlined.

Defendant, 27, then testified. He said he had worked from 3:45 p.m. to 12 midnight on November 30, 1978, but on cross-examination said he was not certain of his whereabouts during the early morning hours of December 1, 1978. He also said he fell on his knee in mid-December, causing a scar.

He testified that on December 1, 1978, he had sideburns, a beard, mustache, and straightened hair.

On cross-examination defendant described his fall in mid-December and stated that Ruth Banks, a co-worker, had given him first aid. When the police came to arrest him he was underneath the bed. Upon further questioning as to the scar on his knee, he said he fell in mid-July. Later he said that the scar from mid-July was on his left knee.

Ruth Banks testified that she recalled administering first aid to defendant's knee in December 1978.

The defense rested after submitting some exhibits. The composite sketch drawn by Holmes was not admitted into evidence.

The jury found defendant guilty on all four counts of the indictment and the trial court sentenced him to 28 years for rape, deviate sexual assault and armed robbery, and 10 years for aggravated kidnaping, all to run concurrently.

OPINION

Defendant first contends that the trial court's refusal to admit the police artist sketch into evidence was reversible error because the whole case against him rested on complainant's testimony. Defendant argues that since the details of her description differ from the features of the sketch, the sketch itself would have impeached her identification. Without this critical evidence, therefore, he was denied a fair trial.

To support his theory defendant relies on *People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223. In *Rogers* the Illinois Supreme Court squarely held for the first time that an "Identi-kit" composite sketch may be admitted to corroborate a victim's testimony as to his or her prior description from which the sketch was made and to corroborate the in-court identification. In so ruling, the court rejected the State's argument that such a sketch is impermissible hearsay, stating that the rationale for excluding hearsay is that the opportunity to ascertain the declarant's veracity is absent. When a victim or witness is available to testify under oath concerning his extrajudicial identification of defendant to a police artist; however, the hearsay rule does not apply. In the *Rogers* case, the victim not only testified in court regarding his description to the police artist but also testified as to the *authenticity* of the photocopy of the Identi-kit composite sketch. Furthermore, the officer who helped the victim prepare the composite testified at trial and also authenticated the photocopy. The supreme court concluded that the hearsay rule did not bar admission of the sketch, but further ruled that it was not to be considered substantive evidence.

Defendant urges us to apply the *Rogers* rationale to the facts of his case, which presents a converse situation: is it error to *exclude* a composite sketch when it is offered to impeach the witness' out-of-court identification?

We agree that the *Rogers'* logic extends to the admission of sketches or photographs for impeachment purposes (see *People v. Dixon* (1982), 104 Ill. App. 3d 533, 538, 432 N.E.2d 1179; *People v. Carmack* (1982), 103 Ill. App. 3d 1027, 1036, 432 N.E.2d 282); nevertheless, exclusion of such evidence may be harmless error if the evidence is overwhelmingly against defendant (*People v. Carmack* (1982), 103 Ill. App. 3d 1027, 1037, 432 N.E.2d 282, 283) and no substantial prejudice to defendant is evident. (*People v. Dixon* (1982), 104 Ill. App. 3d 533, 538, 432 N.E.2d 1179, 1184; see also *People v. Aldridge* (1981), 101 Ill. App. 3d 181, 185, 427 N.E.2d 1001 (not error to exclude sketch if it is non-impeaching and merely cumulative).) In *People v. Schmitt* (1981), 99 Ill. App. 3d 184, 424 N.E.2d 1267, the court considered an argument very similar to the one defendant makes here. After acknowledging the propriety of allowing impeachment of a witness' identification by use of a composite sketch, the *Schmitt* court noted that the complaining witness had not adopted the composite sketch as an accurate portrayal of her attacker. As the court explained,

"Because it was not adopted by her, the sketch cannot be used as a prior inconsistent statement to impeach her subsequent in-court identification. If the rule were otherwise and did not require the witness to adopt the drawing as an accurate portrayal, an inept artist could cause the witness to be impeached by a drawing which did not reflect the description given by the witness, even though that description may have been accurate. In other words, the artist could make a drawing that was not a likeness and attribute it to the witness, without the witness' having the opportunity to say that it did, or did not, look like the alleged perpetrator. It is also conceivable that a skillful artist could use the Identi-kit technique and yet be unable to produce a likeness. Recognizing that limitations do exist in the Identi-kit procedure, we deem it unsound to set a precedent whereby such sketches could be admitted without prior adoption and confirmation by the person primarily responsible for identification." 99 Ill. App. 3d 184, 187, 424 N.E.2d 1267, 1269-70.

■ In searching the record we find no indication that either the complainant or Officer Holmes identified the drawing as being the one

they had worked on together in December of 1978. Holmes admitted that it was his drawing, done in the course of his work, but he also testified that he did not recall facts and names connected with the sketches he made for police purposes. He could not state definitely that he made the drawing for complainant or that she described her assailant as having features such as a long face, prominent jaw, and nostrils that were not visible. Instead he described the drawing as having these characteristics. Complainant testified as to her verbal description that she had given Officer Holmes; she did not describe the sketch itself or testify that the sketch that Holmes referred to was the same one she had participated in. Nor was she given an opportunity to explain whether or not the sketch was an accurate portrayal of her assailant. Under these circumstances we hold that no proper foundation for the admission of the sketch was ever made. *Cf. People v. Tyllas* (1981), 96 Ill. App. 3d 1, 4 n.1, 420 N.E.2d 625, 627 n.1.

Alternatively, we hold that if the trial court erred in excluding the sketch, it was harmless error because the jury heard testimony of all descriptions and were thus made aware of any discrepancies between the sketch and the victim's description. We conclude that defendant was not denied a fair trial.

Next, defendant contends that he was deprived of his constitutional right to choose his own counsel when the trial court refused to appoint a bar association lawyer to represent him. He does not suggest that the public defender assigned to his case was ineffective but insists that the right to counsel of choice is so fundamental that its denial cannot be considered harmless error.

When defendant first appeared in court and requested the trial court to appoint for him a Chicago Bar Association attorney rather than the public defender, he explained that he did not "feel the Public Defender's Office would be able to give [him] adequate representation" because it would not be able to spend enough time preparing his defense. After inquiring whether there were any other grounds for defendant's request the judge denied it, stating that in his experience the public defenders had demonstrated that they were better prepared than private attorneys.

Under the pertinent law, a defendant has an unqualified right to assistance of counsel (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, sec. 8) but the right of choice, a part of this fundamental right, is not absolute. (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 196, 384 N.E.2d 767.) Therefore, if a request for a particular counsel is a subterfuge or a dilatory tactic, or otherwise interferes with the or-

derly administration of justice, the court's denial of the request is not an abuse of discretion (*People v. Spurlark*). Furthermore, although an indigent defendant is entitled to competent counsel, he does not have the right to select his court-appointed attorney. (*People v. Woods* (1963), 26 Ill. 2d 557, 560, 188 N.E.2d 1, *cert. denied* (1963), 373 U.S. 945, 10 L. Ed. 2d 699, 83 S. Ct. 1555.) His case will generally be assigned to a public defender, unless the trial court finds such appointment would prejudice his rights. (*People v. Woods* (1980), 84 Ill. App. 3d 938, 405 N.E.2d 1238; Ill. Rev. Stat. 1979, ch. 38, par. 113—3(b); see Ill. Rev. Stat. 1979, ch. 34, par. 5604.) In *People v. Woods*, we rejected the argument that a defendant could demand a bar association attorney based on his assertion that there was a report of "inadequacies" in the public defender's office and that the public defenders were assigned to specific courtrooms rather than specific defendants. We held that the defendant had not shown how he would be specifically prejudiced by the appointment of the public defender.

■ In the pending case defendant's only reason for his request was his belief that a bar association attorney would have more time to prepare his defense. He did not indicate that he could not work with the public defender assigned to his case. Moreover, he was given the court's permission to file a written motion and he was also granted a continuance to see if his family could retain private counsel. The trial began eight months after this initial request for a bar association attorney and in that time he never renewed his request or obtained private counsel. He offered no substantiation of the charge that the public defender's office was unable to spend ample time on his case. Finally, there is nothing in the record to indicate that he was dissatisfied with his appointed attorneys or that he received inadequate representation. In light of these circumstances we find that the trial court did not abuse its discretion.

Defendant's next contention, that he was not proved guilty beyond a reasonable doubt, is based on purported "major variances" between the victim's description of defendant and the police artist's sketch; the description the victim gave to the officer at the hospital; and the victim's failure to observe a 10-inch scar 3 inches away from the mole or mark on defendant's right knee.

We find this argument unpersuasive in light of the strong, positive evidence against him. Complainant was with defendant for six hours, saw him in varying but adequate lighting conditions, selected his photograph out of 1,000-1,500 other photographs, described the distinctive round mole on his right knee to officers, selected defendant out of a lineup and gave detailed, unshaken trial testimony regarding the

entire occurrence.

Defendant overemphasizes the importance of the police artist's sketch. As we have discussed, the sketch was never identified as being the same one that Officer Holmes and the victim prepared in December of 1978. Notwithstanding that omission, the jury was informed of the supposed discrepancies between the sketch and defendant's features. Defendant does not deny that the photograph the victim identified was his. Moreover, one person's sketch of another person, based on a verbal description of still another, is not likely to possess photographic accuracy.

Nor do we agree that complainant's testimony was significantly impeached by Officer Davis' failure to recall whether she told him at the hospital that defendant had a scant beard and mustache. She did describe sideburns that reached down the sides of his face to his mouth. Significantly, she recognized his photograph, in which he wore a beard and mustache.

Finally, we reject defendant's implication that her credibility was destroyed by her failure to notice the 10-inch scar 3 inches away from the distinctive round mole or mark on defendant's knee. The police officer who examined defendant's knee following the lineup also testified that he did not notice the other scar. The record also reflects that the jury was allowed to view defendant's legs and scars for themselves.

■ The credible testimony of a single witness who viewed defendant under circumstances that would permit a positive identification is sufficient to support a conviction. (*People v. Mays* (1979), 74 Ill. App. 3d 145, 154, 392 N.E.2d 106, 114.) The jury evaluated the witnesses' credibility and found defendant guilty beyond a reasonable doubt. We have no basis to overturn that verdict.

Finally, defendant challenges the length of his concurrent prison terms, arguing that the trial court failed to seriously consider his rehabilitative potential and the mitigating factors of his employment and his fatherhood.

■ The record expressly reflects that the trial court read the presentencing report in its entirety and was aware of defendant's background and character. The court heard both sides argue and allowed defendant to speak on his own behalf. Consideration of mitigating factors and rehabilitative potential does not mandate the imposition of a low sentence; rather, the trial judge must balance all the relevant circumstances and determine what he or she considers an appropriate sentence. We do not conclude that the terms imposed constitute an abuse of discretion. The victim was subjected to six hours of threat-

ened and actual armed force, repeated sexual abuse, threats on her life, confinement in the trunk of her car, and loss of her property. We do not find defendant's sentence excessive under the circumstances.

For the foregoing reasons we affirm the trial court's judgment in the verdict against defendant and also affirm the sentencing determination.

Affirmed.

LORENZ and MEJDA, JJ., concur.