[No. D010262. Fourth Dist., Div. One. Jan. 28, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN FRANCIS MAIER, Defendant and Appellant.

## COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, and Carl H. Horst, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**NARES, J.**—Following convictions by jury of first degree murder with robbery and financial-gain special circumstances, attempted murder, and burglary, all while armed, John Francis Maier (Maier) was sentenced to state prison for life without possibility of parole for the murder, consecutive to the life sentence for murder he is now serving in New York, and an additional 10 years for the attempted murder.

On this appeal Maier asserts trial court error in rulings upholding admissibility of a weapon and a confession. He also argues the robbery special circumstance was unsupported by the evidence and tainted by instructional error. We reject these contentions, and affirm the judgment.

### FACTS

Maier is an armed robber. After Maier's arrival in San Diego from New York, he and Steven Stubbs specialized in robbing drug dealers. Maier and

Stubbs went to a Lemon Grove auto body business owned by Thomas Crawford on the night of March 26, 1984. Although Maier and Stubbs had originally planned a robbery of Crawford, who was a drug dealer, on the evening in question they went to the auto body shop in order to execute Crawford for pay, pursuant to a $25,000 contract they had accepted from David Mendez.

Holly Todd was at the garage with Crawford that evening. She heard a loud noise, and was then confronted by one of two gunmen, who ordered her to face the wall. She heard one gunman demand Crawford count out money. (Another person had delivered $2,000 to Crawford that afternoon to purchase drugs.) Crawford was next told the amount was inadequate. Crawford said he could get the rest of the money in the morning. A gunman said, "It's too late," the other gunman laughed, and Crawford was shot.

Todd looked down at Crawford's body, and then looked up at Maier and said, "You asshole. You shot him." As Todd turned back to assist Crawford, she was also shot in the head. Crawford died from a close-range gunshot entering behind the left ear. Todd survived a similar wound after extended hospitalization.

## DISCUSSION

### I

### SEIZURE OF THE MURDER WEAPON

Maier was the target of a New York state "task force" for (among other things) armed robberies, murder, and the attempted murder of a police officer, which crimes the very dangerous and assaultive Maier committed while armed and with a confederate. Maier was also a prison escapee.

New York authorities tracked Maier first to California, and later in July 1984, to the home of his girlfriend's parents in Elburn, Illinois. They asked Illinois officers for help in capturing Maier, and briefed them on his background. On the morning of July 6, Nancy Gilkey had stopped by this house and seen Maier there. Police asked her to help with the arrest by going into the house and coming out and signaling to them if Maier was inside. She entered the house and then emerged and indicated Maier was inside. The New York and Illinois officers then approached the residence, saw Maier, and demanded he come out with his hands up. Maier disappeared from view for a few seconds, and then came outside.

While Maier was ordered to a prone position, other officers were told to search the house for confederates. Rick McKinnes, a sheriff's deputy, had

been told other suspects could be in the house. He entered an upstairs bedroom with his gun drawn, checked the closet, and saw a large pile of laundry on a bed. While looking for a possible suspect under the pile of clothing on the bed, he removed a bag from the pile. While doing so, he felt a heavy weight in it, and by touching the outside determined a handgun was within. McKinnes continued his search for other persons and after finding none, unzipped the bag and removed the gun. This was the weapon used in Crawford's execution.

The trial court accepted the district attorney's argument that the search of the Illinois residence which resulted in seizure of the murder weapon was justified either as a protective sweep for accomplices, or on the basis Maier, as a prison escapee, had no Fourth Amendment rights.[1]

■ Maier now argues the search of the house was improper on either of the grounds relied upon by the trial court, and that insofar as his later statements were motivated by this search, they also should have been excluded from evidence. We are satisfied, however, that entry into the residence from which Maier had exited and seizure of the murder weapon therein were lawful as part of a search for others ("protective sweep") under a controlling interpretation of the Fourth Amendment by the United States Supreme Court in *Maryland* v. *Buie* (1990) 494 U.S. 325 [108 L.Ed.2d 276, 110 S.Ct. 1093]. The court began its opinion with a definition: "A 'protective sweep' is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others." (*Id.* at p. __ [108 L.Ed.2d at p. 281].)

The facts to which this applied are clear. Police officers entered Buie's house to execute an arrest warrant, fanning out through the house. After Buie came up from the basement and was handcuffed, an officer entered the basement to see whether others might be present. In the basement he observed evidence in plain view. The question of admissibility of the evidence was resolved affirmatively, as the court held protective sweeps proper where an officer possesses a reasonable belief based on articulable facts which justify him "in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Maryland* v. *Buie, supra,* 494 U.S. at p. __ [108 L.Ed.2d at p. 286].)

---

[1] In view of the following analysis, there is no need to explore the "escaped prisoner" theory, which would require us to determine Maier's status under the law of New York, then ascertain how that status was treated by the law of Illinois, following which we would attempt to apply the United States Constitution to these matters in a California proceeding. We decline the *Star Trek* invitation to go where no court has gone before. The question before us is simple: was the Illinois "protective sweep" proper under the United States Constitution and the laws of Illinois? (*People* v. *Phillips* (1985) 41 Cal.3d 29, 79-80 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Blair* (1979) 25 Cal.3d 640, 656 [159 Cal.Rptr. 818, 602 P.2d 738].)

Maier attempts to distinguish *Buie* on the grounds Maier was arrested after being ordered outside the house, while Buie was arrested inside his house after being ordered to come out of the basement. To support the distinction, Maier cites language from *Buie* to the effect protective sweeps "are limited to that which is necessary to protect the safety of officers and others." (*Maryland* v. *Buie, supra*, 494 U.S. at p. __ [108 L.Ed.2d at p. 287, fn. 3].) But as pointed out by the dissent in *Buie*, Buie was outside his house in handcuffs when entry into his basement was made. (*Id.* at p. __ [108 L.Ed.2d at p. 291, fn. 4].) An accomplice on another floor is surely no more dangerous than one on the other side of a window, or a door.

The basic question is whether the limited inspection of the premises was reasonable in each case, that is, was it in fact a protective sweep, based upon articulable and reasonable facts supporting a belief in possible danger to officers or others, or was it an otherwise impermissible warrantless search for evidence? This, rather than on which side of a door an arrest is effected, is the issue in these limited-inspection cases.

The trial judge here found a protective sweep reasonable:

"The evidence clearly shows that the police knew that Mr. Maier habitually pursued his criminal activities with accomplices in a most dangerous manner. This was his modus operandi. Accordingly, it was both reasonable and proper for the police to search the house for other suspects after the defendant was apprehended and arrested. Thus, when Kane County deputy sheriff McKinnes searched an upstairs bedroom for suspects, he was acting properly.

"It is important to note here that he was not searching for evidence but was searching for suspects."

The trial judge having specifically found the officers' belief reasonable[2] and entry of the bedroom of the residence at which Maier had been arrested was to seek other individuals rather than to search for evidence, *Buie* is not properly distinguishable from the facts of this case, and thus it is dispositive. The protective sweep which resulted in the discovery of the murder weapon here was thus, as determined by the trier of fact, properly limited in time and scope under the standards that were later enunciated in *Buie*.

---

[2] Maier also asserts the officers could not reasonably have believed an accomplice was in the house because Nancy Gilkey did not see anyone else inside. She entered the house only long enough, however, to see Maier was inside, and then left to signal the officers. She was not inside long enough to have searched for accomplices even had she been asked to do so. Her actions did not render the officers' belief in the possible presence of an accomplice unreasonable.

As it happens, *Buie* was anticipated by cases decided by the Illinois Supreme Court and appellate courts, validating the "protective sweep" doctrine when such a search is supported by a reasonable and good faith belief by officers that a sweep to seek out the possible presence of others than the one arrested is necessary to protect the safety of the officers or others.

In *People* v. *Carmack* (1982) 103 Ill.App.3d 1027 [432 N.E.2d 282], an armed robber was arrested in his house, and refused permission to search it. Before obtaining a warrant, officers who knew Carmack had boasted of an accomplice walked through the house to locate any other persons present. During the walk through, evidence related to the armed robberies was observed. The Appellate Court of Illinois, Third District, held a limited search for other persons proper "where the police reasonably believed a dangerous accomplice might have been staying at the house." (*Id.* at p. 1035 [432 N.E.2d at p. 287].)

A premises sweep was also held proper in an out-of-house arrest without prior information about accomplices. In *People* v. *Free* (1983) 94 Ill.2d 378 [447 N.E.2d 218], cert. den. 464 U.S. 865 [78 L.Ed.2d 175, 104 S.Ct. 200], reh. den. 464 U.S. 1004 [78 L.Ed.2d 701, 104 S.Ct. 514], officers surrounded Free's house and ordered him out. They saw someone at the front and at the back, and fired a tear gas canister inside. Free came out and was ordered to lie prone, and was handcuffed. One officer entered the house to retrieve the tear gas canister, and two others entered to determine if anyone else was inside. The latter observed evidence relevant to a murder of which Free was convicted. In response to Free's challenge to the warrantless entry, the Illinois Supreme Court held:

"Although there was no evidence that the defendant had an accomplice in the commission of the crimes, one officer testified that he saw someone at both the front and the back windows of the house before the defendant came out, and he could not be sure if both were the same person . . . . There was a potentiality for danger . . . which justified the 'protective sweep' of the house." [*Id.* at p. __ [447 N.E.2d at p. 227].)

In these circumstances we deem it clear the search accompanying the arrest of Maier did not violate the laws of Illinois, nor did it violate the Constitution of the United States.[3] Under the foregoing decisions of the

---

[3] Although not a necessary part of our analysis (see *ante*, fn. 1), California law also would have validated the present search, even before *Buie*. (See, e.g., *Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919 [226 Cal.Rptr. 868, 719 P.2d 242] [search for other victims]; *People* v. *Mack* (1980) 27 Cal.3d 145 [165 Cal.Rptr. 113, 611 P.2d 454] [search for other suspects]; and *People* v. *Keener* (1983) 148 Cal.App.3d 73 [195 Cal.Rptr. 733] [search for other victims *or*

United States Supreme Court and Illinois courts, the gun was found in a lawful sweep appurtenant to an arrest, and we need not further address the parties' remaining contentions on this issue.

## II

### ADMISSIBILITY OF MAIER'S STATEMENTS

John Hindes was a special agent for the state of Illinois in 1984. He was the officer who arrested Maier on July 6. After the arrest Hindes advised Maier of his *Miranda* [4] rights and Maier acknowledged them, although he would not sign a statement to that effect. After the advisement Hindes discussed with Maier some of the problems facing Maier both in New York and California, although Hindes's primary task at this time was booking Maier. At the end of the conversation, Hindes told Maier they would talk again later.

After arresting Maier, Hindes called detectives Henderson and Fullmer of the San Diego County Sheriff's Office, concerning Maier's possible involvement in a California homicide. Hindes returned on July 9, and asked Maier if he remembered his *Miranda* rights. Maier said he did, and agreed to talk. Following this conversation, Hindes called the San Diego sheriff's officers a second time from Illinois.

On July 13 Henderson and Fullmer met with Hindes and Maier at the Kane County jail. Hindes left the room, and Henderson advised Maier of his *Miranda* rights, which Maier stated he understood and waived. Maier agreed to talk with Henderson and Fullmer, although he would not allow the conversation to be recorded Then Maier said: "If you want to beat around the fucking bush, I won't tell you shit. But if you want to know who murdered the couple . . . on Skyline Drive in the auto body shop, I can tell you, because I was there."

■ Maier claims his refusal to sign a waiver July 6 and to be tape-recorded July 13 were invocations of his right to remain silent, and the questionings which followed were therefore impermissible. Maier also argues that the refusal to be tape-recorded might have indicated he did not understand his rights, or was in some manner talking "off the record."

The question whether Maier understood and waived his rights before agreeing to speak to the officers was one of fact. While accepting the trial

suspects], all involving warrantless entries into premises after arrests were made either outside or at the door.)

[4]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

court's resolution of disputed issues, we will also independently determine from the undisputed facts whether the challenged statement was illegally obtained. (*People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610].)

In this case, it was for the trial court to determine whether Maier's refusal to sign or to be recorded was in fact an invocation of his right to silence. The court found Maier in fact had understood his rights and waived them, and his conversations with the officers were therefore voluntary. Such a conclusion was reasonable, and we will not disturb it on this appeal. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Warner* (1988) 203 Cal.App.3d 1122, 1131 [250 Cal.Rptr. 462].)

So far as Maier asserts the evidence below does not support a finding he waived his rights, we reject the contention; so far as he claims the evidence shows he may not have understood his rights, the contention is meritless. The admissions and confessions Maier made in these interviews, after having been properly advised, were properly received in evidence at trial.

## III

### INSTRUCTIONS AND FINDINGS ON ROBBERY SPECIAL CIRCUMSTANCE

Following the prosecution's opening argument after the close of evidence, defense counsel requested the felony-murder (robbery) special verdict form have the words " 'in the attempted commission or flight from' " stricken, as there was assertedly no evidence on those points. The trial judge agreed, although his agreement was only to strike language concerning flight. (The companion instruction, given without objection, discussed robbery and attempted robbery.) In any event, the jury found it true that Maier murdered Thomas Crawford while "engaged in the commission or attempted commission of robbery," but one juror refused to vote to convict him of the underlying robbery.

■ Maier now claims the evidence is insufficient to support a true finding on the robbery-murder special circumstance, and under *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], a special circumstance may not stand after acquittal of the underlying offense. The simple answer here is that the defendant in *McDonald* was found not guilty of the underlying offense, while Maier, far from being found not guilty, in fact had 11 jurors voting to the contrary. The law does not require a conviction of the underlying offense for a special circumstance to stand. (*People* v. *Morris* (1988) 46 Cal.3d 1, 16-18 [249 Cal.Rptr.

119, 756 P.2d 843].) The proof in this case would have amply supported a robbery verdict if returned, and is fully sufficient to support the true finding on the special circumstance of robbery-murder.

Maier last argues in the alternative (a) the prosecution is estopped from arguing the sufficiency of the evidence to support the finding on the special circumstance, or (b) his trial counsel was incompetent for failing to ensure the "attempt" language was also deleted from the verdict form.

Both arguments derive from an assumption the prosecution agreed at trial there was no evidence to support a finding of attempted robbery. All the record shows, however, is when asked whether he had any objection to a revision of the verdict form understood by the court as having only to do with *flight*, the prosecutor replied, "No." Maier's trial counsel may have also desired to remove the question of attempt from the jury, but nothing in the record indicates she would have been successful in this endeavor, particularly where, as here, the companion instruction to the verdict form discusses the necessity for determining whether Maier was engaged in "the commission or the attempted commission of a robbery." We thus find neither insufficiency of the evidence nor any basis for asserting the People are estopped from arguing the contrary.

■ Finally, this record will not support the argument Maier was deprived of the effective assistance of counsel. The test here is whether (1) counsel's performance fell below an objective standard of reasonableness, and (2) the defense was thereby prejudiced. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 948 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) Neither prong of this test is met in this case.

On the record in this case, trial counsel's performance consistently adhered to the highest professional standards. Further, even were we to assume a deficiency, in view of the properly given instruction accompanying the verdict form, which (along with the evidence received) fully supported the true finding returned by the jury, we would have to find that any deficiency in counsel's performance would have been, in any event, harmless in that no other result was reasonably probable.

## DISPOSITION

The judgment is affirmed.

Todd, Acting P. J., and Benke, J., concurred.

A petition for a rehearing was denied February 13, 1991, and appellant's petition for review by the Supreme Court was denied April 11, 1991. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.